### WILLIAM F. MURDOCK and others *v.* THE UNION BANK OF LOUISIANA.

A bank will be responsible for the amount of a note issued by it, on proof of its loss and of the contents of the note. So, on the production of the half of a note, where the absence of the other half is fairly accounted for, the bank will be bound to pay the full amount for which it was issued, on being secured against liability for the other half.

The half of a bank note, cut in two, is not negotiable. The negotiability of the note can only be restored by re-uniting the parts.

In an action by the holder of the half of a bank note, where the half on which the president's signature is usually affixed has been lost, the signature of the president need not be proved. It will not be presumed that notes were ever issued without the signature of that officer.

Murdock and others v. The Union Bank of Louisiana.

APPEAL from the Commercial Court of New Orleans, *Watts*, J.
*Wharton*, for the plaintiffs.

*Denis*, for the appellants.

GARLAND, J. On the 6th of March, 1841, the plaintiffs, by
their clerk or agent, deposited in the post office in Baltimore, a
letter written by them, addressed to Benjamin Story in New Or-
leans, which contained the right hand halves of the following
notes of the defendants : No. 366, $50 ; No. 394, A. $100 ; No.
1898, A. $100 ; No. 2218, A. 100 ; No. 301, A. $100 ; also the
halves of various notes of other banks, and a bill of exchange.
This letter never reached its place of destination, and it is in evi-
dence that the mail which was made up in Baltimore on the 6th
of March, 1841, for New Orleans, never reached this city. The
loss of this letter, and a statement of its contents, were advertised
for one month in a newspaper published in New Orleans, but
nothing was ever heard of it. Story testifies that the left hand
halves of the notes filed with the petition, were received by him
in a letter from New York, with instructions to hold them for the
plaintiffs who reside in Baltimore. These left hand halves are
signed by J. B. Perrault, Cashier. His signature is admitted to
be genuine ; and it is admitted that he was the cashier of the de-
fendants, at the date of the notes. These halves are No. 2218,
A. $100 ; No. 1898, A. $100 ; A. $100, the No. so blotted or
erased as not to be visible ; No. 394, A. $100 ; No. 366, $50.
From what is visible in English and French, on the face of the
halves of four of the notes, it is palpable that the Union Bank of
Louisiana promise to pay A. C. Tremoulet, or bearer, the sum
of one hundred dollars on each note. On the note purporting to
be for fifty dollars, every thing necessary to make out the promise
to pay A. C. Tremoulet, or bearer, that sum, is apparent, except
the word *dollars*. The half notes were presented to the Bank for
payment, and an offer made of a bond with good security to pro-
tect it from damage, or danger of re-payment, in case the moie-
ties lost should ever be presented for payment. The President
refused to pay more than half the amount of the notes, to wit,
$225. This was refused.

On the part of the defendants it was shown, that some of the
notes of the Bank have two numbers, one on the right and the

other on the left, which it is often difficult to distinguish, in consequence of the ink being effaced by frequent handling. The notes of one hundred, and of fifty dollars, have generally the number on each end, but only one letter on the left hand side. The issues are always made in series of the letters A and B, and frequently of the letters A, B, C, D, each of the series having the same numbers. The numbers of the notes of each denomination are not continued. There are notes of the same letter and number, which can only be distinguished by the date of the issue, which is to be found on the right hand of the note. It is impossible to identify two separate halves, as being halves of the same note. The Cashier of the Bank puts a case to illustrate the idea he wishes to impress on the court. He says, "suppose that the left hand half of the note with the signature of the Cashier, being A No. 1, was paid for the full amount of the whole note, and that afterwards the right hand half, with the signature of the President, and likewise with the No. 1, but without the letter, was presented for payment; it could not be proved that this half was part of the note already paid, there being nothing to show to what series, whether A, B, C, or D, it belonged, nor whether the half note paid was of the same issue." In paying the notes, the signatures are the principal guide, the numbers being frequently erased.

These are the facts of the case. The defendants pleaded a general denial, and further averred that if all the allegations in the petition were true, the plaintiffs could not recover. There was a judgment for the amount claimed, with costs, directing the plaintiffs to give bond and security in the sum of one thousand dollars, to save the defendants harmless from any demand of payment on the halves of the notes alleged to have been lost, and from any loss or damage that may accrue from their non-production in court. From this judgment the defendants have appealed.

The defendants contend that they are not bound to pay any thing, unless the whole note be produced. They say that a corporation can only be bound by the acts of its agents; that these agents in the present case, are the President and Cashier; and that no note or obligation is binding upon the corporate body, unless it bears the signature of both these officers.

As a general principle of law, it is well settled that one does.

not lose his right to real or personal property, or to a debt, by losing the evidence of it. If the whole note of a bank were lost, and its contents could be established by evidence, we believe that the amount could be recovered, as in the case of the note of an individual. If half of the note be produced, and its mutilated appearance fairly accounted for, we are also of opinion, that the bank is bound to pay the note in full. In the case of *Bullit* v. *The Bank of Pennsylvania*, 2 Wash. C. C. R. 172, it was held, that if a bank note be divided, and half of it lost, the *bona fide* holder of the half which is produced, is entitled to payment of its amount, on proving the loss of the other part, and accounting for the mutilated appearance of that which is produced ; and that the holder of the part which was lost or stolen, which may afterwards be found, will take it from the finder or the robber, subject to every defence, which could have been legally made against the finder or robber. The facts of the case are very similar to the one under consideration.

In the case of *Martin* v *The Bank of the United States*, it was held, that where the holder of a bank note cuts it in half, for the purpose of more safely transmitting it, and one of the halves is lost, but the other arrives at its destination, he may recover the whole amount, and this though the note was cut after notice from the bank that, after a certain day, when their notes were voluntarily cut into parts, they would not pay them, unless all the parts were produced, which was known to the party prior to his cutting the note in question. Coxe's Dig. 81.

In the cases of *Ward* v. *The Bank of Virginia*, 6 Munford's Rep. 166, and of *Reynolds* v. *The Farmers' Bank of Virginia*, 4 Randolph, 186, it was decided, that where a bank note was cut into two parts, and one half was sent by mail and lost, the holder of the remaining half had a right to demand payment at the bank, upon the presentation of the half in his possession, by proving ownership, and giving adequate security for the indemnification of the bank, in case the lost halves should ever be presented.

In the case of *Patton* v. *The State Bank of South Carolina*, 2 Nott & McCord's Rep. 464, the same doctrine is recognized. In 1 Mart. 12, Judges Matthews and Lewis held, that a bank was bound to pay a note from which the signatures of both Cashier and

President had been torn, it being proved from the number, letter, and name of the payee that the note was genuine, and that a note of a similar number and letter had been put in circulation .

It is shown, in this case, that the halves of the notes produced belong to the plaintiffs. The halves lost also belonged to them. By reference to the list of the notes set forth in the deposition of the witness in Baltimore, it will be seen that the lost halves are of precisely the same numbers and letter, and for the same sums as those produced. The signature of the Cashier is admitted to be genuine, and there is no question of the genuineness of the notes, so far as the halves can exhibit the fact. The amount for which each note is given, can be plainly seen on the face of the half note. The loss of the right hand halves of the notes is satisfactorily shown. They were duly advertised in conformity with article 2259 of the Code, and have never been seen or heard of since they were deposited in the post office in Baltimore. A bond, with ample security, has been given to indemnify the defendants against any loss that may be sustained in case the lost halves of the notes shall ever be produced.

The objection founded on the case or supposition put by the Cashier, appears to us more applicable to the halves of the notes lost, in the hands of the finder or holder, than to those in the hands of the plaintiffs. They produce the halves under circumstances not at all suspicious. They are the owners, and account for the mutilation of the notes in a reasonable manner. By cutting the notes in two, their negotiability was destroyed until re-united, and it would be almost impossible for the finder of the lost halves to recover on them. If he did, it would be by making it appear that they were the halves of some other notes than those sued on, and such a result could be produced in no other way, than from the confusion which might arise from the Bank having issued two notes of the same letter and number, and from its relying on the date alone to distinguish the series. This is their own fault, and should not prejudice the plaintiffs.

As to the objection, that there is no evidence of the lost halves having been signed by the President of the Bank, we think that although the witness does not say that they were actually signed

by him, there is sufficient evidence to induce a strong belief·that they were so signed. The witness speaks of the halves of the· notes of the defendants. The halves produced are no doubt parts of genuine notes. It is not to be presumed that the Bank ever is-- sued notes without the signature of the President. Nothing has been alleged or proved to raise a suspicion that any notes, not signed by the President, have ever been stolen from the Bank or lost, or that any such notes have ever got into circulation. The probability of any serious loss accruing to the institution by an affirmance of the judgment, is too distant to justify the discharge of the defendants.

*Judgment affirmed.*